MEF
F. #2022R00913
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE BLACK TCL SMARTPHONE, SEIZED INCIDENT TO THE ARREST OF PATRICIA PERALTA ON MAY 11, 2023 AT 96 S. 34TH STREET, WYANDANCH, NEW YORK, CURRENTLY LOCATED AT THE HOMELAND SECURITY INVESTIGATIONS OFFICE AT 545 FEDERAL PLAZA, CENTRAL ISLIP, NEW YORK 11722 | **APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE**<br><br>Case No. 23-mj-470 |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, DANIELLE BROUARD, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and I have been since 2019.  I am also a Corrections Officer Investigator with the Suffolk County Sheriff's Office ("SCSO"), and I have been since 2018.  Prior to that, beginning in 2004, I was a Corrections Officer with the SCSO.  I am presently assigned to HSI's Long Island Public Safety Group, which seeks to investigate crimes involving human trafficking and labor trafficking, among others.  In that capacity, I am

responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for transnational sex and human trafficking and related offenses.  I have participated in investigations involving the debriefing of sex trafficking victims and the review of telephone records, cell site location and GPS data, money transfer records, surveillance, cell phone evidence, pen register information, and various other techniques.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.     The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses, including police officers employed by the Suffolk County Police Department ("SCPD") and Nassau County Police Department ("NCPD").  This affidavit is intended to show merely that there is probable cause for the requested warrants and therefore it does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is a Black Smartphone, seized incident to the arrest of PATRICIA PERALTA ("PERALTA") on May 11, 2023 at 96 S. 34th Street, Wyandanch, New York, hereinafter the "Device."  The Device is currently located at the Homeland Security Investigations Office at 545 Federal Plaza, Central Islip, New York 11722.

5.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.      As described further below, the United States, including HSI, the SCPD

and the NCPD, is conducting a criminal investigation of DAVID M. AMIN, JR., also known as

"Sonny B," "Rico," "Tone," "Anthony" and "Jonathan Santos" ("D. AMIN"), BRYCE K.

AMIN, also known as "Busy B" ("B. AMIN"), PERALTA, and others known and unknown, for

violations of Title 18, United States Code, Sections 1591 and 1594(c) (sex trafficking and sex

trafficking conspiracy), 2422 (interstate prostitution), 1956 (money laundering), 1952(a)(3)(A)

(promotion of prostitution), and 1791(d)(1)(F) (possession of contraband within a prison), and

Title 21, United States Code, Sections 841(a), 841(b)(1)(C) and 846 (narcotics trafficking and

narcotics trafficking conspiracy) (the "Subject Offenses").

7.      More specifically, on March 1, 2023, a grand jury sitting in the Eastern

District of New York returned a fifteen-count indictment as to D. AMIN and B. AMIN (the

"Indictment") (No. 23-Cr-92 (GRB)(SIL)).  On March 7, 2023, D. AMIN was arrested pursuant

to a search warrant that was issued in connection with the Indictment.  At the time, he, along

with PERALTA, was residing at 14 Essex Court, Freeport, NY 11520 (the "Freeport

Residence").  Although PERALTA was not arrested at that time, law enforcement seized and

searched, inter alia, electronic devices belonging to not only D. AMIN but also PERALTA (the

"Freeport Devices"), pursuant to a search warrant authorized by the Honorable Steven L.

Tiscione, United States Magistrate Judge, which was issued on March 3, 2023 (No. 23-MJ-201).[1]

---

[1]      At the time the Indictment was returned, B. AMIN was in New York State
custody on a parole violation, and although he was subsequently transferred into federal custody,
law enforcement did not execute search warrants on any of his property at that time.

8.     On May 10, 2023, the same grand jury returned a twenty-count superseding indictment as to D. AMIN, B. AMIN and PERALTA (the "Superseding Indictment") (No. 23-Cr-92 (S-1)(GRB)(SIL)).  The Superseding Indictment is attached hereto as Exhibit 1, and it is summarized below for ease of review.

9.     The Superseding Indictment charges the defendants D. AMIN, B. AMIN and PERALTA with conspiracy to distribute and possess with the intent to distribute controlled substances, which conspiracy, as to D. AMIN, involved more than 400 grams of a substance containing fentanyl and more than 500 grams of a substance containing cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi), 841(b)(1)(B)(ii)(II) and 841(b)(1)(C), sex trafficking conspiracy, in violation of 18 U.S.C. § 1594(c), and promotion of prostitution, in violation of 18 U.S.C. § 1952(a)(3)(A); it further charges D. AMIN and PERALTA with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and a February 9, 2023 sale of a substance containing heroin, ANPP, fentanyl and cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C); it further charges D. AMIN with the substantive sex trafficking of five victims, three of which B. AMIN is also charged with trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), 1591(a)(2) and 1591(b)(1), as well as interstate prostitution as to B. AMIN and D. AMIN, in violation of 18 U.S.C. § 2422(a).  Finally, the Superseding Indictment charges D. AMIN with nine additional counts of selling controlled substances, and B. AMIN with one count of selling a controlled substance, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C).

10.     Generally speaking, the investigation revealed that D. AMIN, B. AMIN and PERALTA have been engaged in sex and narcotics trafficking since at least October 2018. As part of their business, the brothers targeted victims battling drug addiction, and then used this extreme vulnerability to cultivate relationships with victims that were beholden to them and their

4

supply of drugs, only to manipulate and force them to engage in commercial sex acts for the financial benefit of all three defendants, as well as forced sex acts with the two brothers personally.  As pimps, D. AMIN and B. AMIN directed when, where and with whom commercial sex acts would be performed, and they used violence to ensure that their demands were met.  Any money earned that D. AMIN and B. AMIN did not collect themselves was immediately due to them and withholding money from them was an offense punishable by violence.  Moreover, both D. AMIN and B. AMIN are self-admitted members of the Bloods street gang, which is evident from not only their tattoos but also their social media presence.

11.     Regarding PERALTA specifically, who is D. AMIN's spouse, the investigation revealed that she affirmatively conspired to sell narcotics and not only knowingly facilitated the forcible trafficking of multiple victims, but also derived substantial financial benefit from that venture.  More specifically, evidence obtained from the Freeport Residence revealed that over the course of the charged time period, PERALTA played a critical role in the conspiracy by posting advertisements for commercial sex, answering calls and text messages from potential customers pursuant to those advertisements and others placed by her coconspirators, directing customers to hotels, cars and apartments for commercial sex, and booking and checking into hotel rooms where victims were forcibly trafficked. While engaged in this conduct, PERALTA was in regular communication with D. AMIN, who was physically present to manage the sex workers and dates.

12.     The conversations between D. AMIN and PERALTA, in which PERALTA is setting up dates for commercial sex, that were recovered from the Freeport Devices alone, span from on or about November 2021 to August 2022.  For example, on November 10, 2021, D. AMIN, who was using the phone number 917-688-6682 (the "6682

Number"), exchanged messages with PERALTA, who was using the phone number 631-809-2202 (the "2202 Number"), which were obtained from an iPhone 12 seized from the Freeport Residence, which based on my review of the phone, including messages, pictures and account identifiers, belongs to PERALTA (the "PERALTA IPHONE"). Further, based on records that I have reviewed, at that time, the 6682 Number was registered to Jonathan Santos, an alias of D. AMIN, and the 2202 Number was registered to "Layla Peralta," the minor daughter of PERALTA and D. AMIN. In those messages, D. AMIN said, "Let's go babe . . . Babe we taking 60 . . . 80 . . . and 100 . . . raw everything." In response, PERALTA said, "Okay cool . . . 28 Spanish ss," which based on my training, experience and knowledge of the investigation, means that PERALTA had arranged for a sex worker to service a 28-year-old Spanish customer who was looking for a "short stay," which is the cheapest of the three options that are commonly offered by people advertising commercial sex acts, i.e., the two were advertising $60 for a short stay, $80 for a half hour, and $100 for an hour. Moreover, I believe that "raw everything" refers to D. AMIN's willingness to accept dates, on behalf of sex workers, that would not require the use of a condom.

13.     There are similar messages in the PERALTA IPHONE from January 11, 2022, between PERALTA and D. AMIN, who were using the same two phone numbers. On that occasion, D. AMIN asked PERALTA to find out from someone seeking commercial sex, who PERALTA was messaging separately, "why he left" before paying the victim sex worker. In response, PERALTA said, "He said bbj swallow lol I said yeah… N she said no he left … H[e's] still there lmk when I can send him." Based on my training, experience and knowledge of this investigation, "bbj" refers to bare oral sex, and "lmk" means let me know. Further, I believe that these messages indicate that the sex worker refused to swallow semen after engaging in oral

sex—which PERALTA had already agreed to on the sex worker's behalf when she was speaking with the customer—and then, after the customer walked out, PERALTA offered to have him come back.  When D. AMIN directed PERALTA to do just that, PERALTA responded, "okay sending him . . [he's] at door."

14.     There are also messages in the PERALTA IPHONE from June 30, 2022, in which D. AMIN, who was using the phone number 631-984-1675 (the "1675 Number"), and PERALTA, who was using the phone number 631-819-4055 (the "4055 Number"), are again discussing commercial sex dates.  Based on records received from Optimum that I have reviewed, at that time, the 1675 Number and the 4055 Number were both registered to "Layla Peralta," although the 4055 was stored as the "owner" of the PERALTA IPHONE.  In those messages, D. AMIN said in relevant part, "i think [s]he lying . . . ask him how mu[c]h he ga[v]e her . . . she said only 100 . . . ???? . . .," and PERALTA responded, "She gave him 60 back . . . Talking about she don't have enough time."  Then PERALTA sent D. AMIN a contemporaneous screenshot of text messages with another individual, who I believe to be a customer, which said "I just gave you 160 and you gave me back the 60 dollars . . . You said you don't have enough time."  Based on my training, experience and knowledge of the investigation, including my broader review of the Freeport Devices, I believe that at the time, PERALTA was operating two phones – one to manage and communicate with potential dates responding to advertisements – and another phone, i.e. ,the PERALTA IPHONE, to communicate with D. AMIN who was physically present with the commercial sex workers at a different location.

15.     In addition to managing commercial sex customers for D. AMIN, PERALTA derived a substantial financial benefit from this operation.  A review of bank records for PERALTA reveals that more than $126,000 in cash deposits were made into a J.P. Morgan

Chase bank account in PERALTA's name (with an account number ending in 2333) between 2021 and 2023, and in 2021 alone, more than $50,000 was deposited into a Bank of America account in her name (which is an account ending in 3629).  I have reviewed five videos obtained from J.P. Morgan Chase that document deposits into the account ending in 2333, and at least one shows PERALTA herself at an ATM depositing cash into this account, while others show D. AMIN making deposits.  Based on records obtained from J.P. Morgan Chase and Bank of America, as well as Priceline, the money in these accounts was then used to pay for luxury vehicles, including a 2021 BMW that PERALTA co-owns with D. AMIN, as well as hotel rooms.  Indeed, based on a review of the records associated with the bank accounts ending in 2333 and 3629, PERALTA booked and paid for at least 30 hotel room reservations on Long Island between 2020 and January 2023, most, if not all, of which were for hotels that she and D. Amin discussed in their messages about sex trafficking.

16.     Moreover, when law enforcement executed search warrants on March 7, 2023, at the Public Storage facility located at 225 Sheep Pasture Rd., Port Jefferson, NY 11777 (the "Storage Facility"), which was rented in D. AMIN's name and associated with the 6682 Number, they recovered $390,100 in cash, shrink wrapped and hidden inside of a Mercedes Benz, which, based on the aforementioned records in addition to records obtained from Mercedes, was one of the two luxury vehicles that D. AMIN purchased in order to launder the proceeds of his and PERALTA's crimes.

17.     On that same date—before the search of the Storage Facility was complete, but after D. AMIN had been taken into custody—law enforcement was notified by a representative of the Storage Facility that a female who fit the description of PERALTA showed up at the location and was trying to gain access.  A subsequent review of surveillance footage

obtained from the Storage Facility revealed that PERALTA was in fact the female who had

showed up.  Additional footage obtained from the Storage Facility revealed that PERALTA

again returned to that location on or about March 10, 2023, and she again attempted to gain

access.

        18.     On April 11, 2023, I was notified by a local lawyer ("John Doe"), who had

recently been retained and then fired by PERALTA, but who refused to return PERALTA's

entire retainer fee based on work he had already done on her case, that he had received a death

threat from an unknown male, who was joined to a call John Doe placed to PERALTA.   More

specifically, the male voice told John Doe, in sum and substance and relevant part, that John Doe

needed to give PERALTA her money back or the male would come to John Doe's office the

following day and shoot him.  This threat caused John Doe and his family great fear.  Thereafter,

I obtained from the Metropolitan Detention Center ("MDC") D. AMIN's phone calls from April

11, 2023.  Although I did not find a recorded call in which D. AMIN made the aforementioned

threat, I did find a call on April 12, 2023 from D. AMIN, who as using another inmate's PIN

number, to PERALTA, in which D. AMIN admitted to threatening John Doe 1 the prior day.

Specifically, after PERALTA told D. AMIN that the "cops" had responded to her father's home

the prior night, looking for her because of John Doe's complaint, D. AMIN stated in substance

and relevant part to PERALTA, "It don't matter. It was me. I called you on three-way . . . you

know what I'm sayin . . . ."  Then, D. AMIN further suggested that PERALTA explain herself to

the police by saying, "my man was on the phone with me on three way, he said he wanted to

speak to the lawyer and he said what he said. I didn't say nothing to the lawyer, I'm just going to

get my bread back."  When PERALTA intimated that she was being questioned by police, D.

AMIN further stated, "Just say I threatened him. Yes, the f**k I did . . . n***er, I'm gonna smoke him if he don't give you ya money back. Tell him. Yeah."

19.     Based on the absence of a call from D. AMIN's MDC account containing the threat, it is possible that D. AMIN was either using the PIN of a third MDC inmate or that he used a contraband cellular telephone within MDC.  Indeed, based on my experience investigating cases in this district, as well as conferring with other law enforcement officers who do the same, I am aware that contraband cellular telephones are frequently located at the MDC, and that inmates purchase them inside of the jail and have third parties, often family members and friends, pay for the service to the telephones.  Moreover, in my training and experience, these phones are often shared amongst inmates, and sometimes "rented" for specific periods of time by multiple inmates within a unit.

20.     Relatedly, I have reviewed a call that D. AMIN made from the MDC to PERALTA, who was using the phone number 631-819-1855 (the "1855 Number"), on or about March 20, 2023 at 7:50 a.m., in which I believe, based on my training and experience, including but not limited to the information above, D. AMIN and PERALTA communicated, in code, about the fact that he had access to and had been using a contraband cellular telephone at the MDC.  In that call, in substance and relevant part, PERALTA asked D. AMIN why he had called her "so late," and D. AMIN responded, in sum and substance, "'Cause I was I was I was ummm…. I was charging . . . you already know . . . feel me? . . . my MP3.  Yo I'm trying to see what's going on with the situation, and if not then I'm going to have you cancel the situation. You feel me?"  After PERALTA said she understood, D. AMIN added, "I'm waitin' . . . I'm like I wasn't on it, but now I'm on it . . . and now it's like what's goin on . . . . we don't, you know what I mean, we don't got too much control but at the end of the day, like, aight fuck it, call

shorty cancel that, it is what it is, you know what I mean?"  Based on this conversation, there is probable cause to believe that, as of March 20, 2023, D. AMIN was renting a cellular telephone at MDC ("my MP3"), and PERALTA was making payments toward his use of that phone, although D. AMIN was disappointed in his level of access at that time.  Moreover, if D. AMIN did not gain increased access to the contraband phone, he was going to have PERALTA stop paying, i.e., "cancel the situation."

21.     Based on a review of records from Optimum, PERALTA is the subscriber for the 1855 Number, which account was activated on March 3, 2023 and kept open until March 27, 2023.  I know from reviewing additional calls by D. AMIN from the MDC to PERALTA, that in April and May of 2023, PERALTA was using the phone number 516-371-1143, which based on records from Verizon, was activated on March 7, 2023, but for which there is no subscriber name.

22.     Based on the above, there is probable cause to believe that PERALTA has used numerous devices and telephone numbers to not only communicate with D. AMIN but also to engage in related criminal activity.  Moreover, there is probable cause to believe that after D. AMIN's arrest, PERALTA used more than one telephone number to communicate with D. AMIN about, inter alia, his recent arrest, the evidence located at and recovered from the Storage Facility, the threat that D. AMIN made to John Doe, with the assistance and for the benefit of PERALTA, and the use of and payment for a contraband telephone at the MDC.  There is further probable cause to believe that the SUBJECT DEVICE will contain evidence of these communications, the phone numbers and accounts used to facilitate these communications and thereby further the charged conspiracies.

23.     The Device is currently in the lawful possession of HSI.  It came into the HSI's possession incident to the May 11, 2023 arrest of PERALTA. Therefore, while HSI might already have all necessary authority to examine the Device, I seek this warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

24.     The Device is currently located at the Homeland Security Investigations Office at 545 Federal Plaza, Central Islip, New York 11722.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HIS.

## **TECHNICAL TERMS**

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

14

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook, that is primarily operated by touching the screen.  Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets

typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those

functions.  Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an

individual through an alert, or a numeric or text message sent over a

telecommunications network.  Some pagers enable the user to send, as well as

receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet.  An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination.  Most Internet service providers control

a range of IP addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

16

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.   **Nature of examination**.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. **Manner of execution.** Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

DANIELLE BROUARD
Task Force Officer
Department of Homeland Security, Homeland
Security Investigations

Subscribed and sworn to before me
On  May  18 , 2023

/s/ Steven L. Tiscione

HONORABLE STEVEN L. TISCIONE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

The property to be searched is a Black TCL Smarphone, seized incident to arrest of PATRICIA PERALTA ("PERALTA") on May 11, 2023 at 96 S. 34th Street, Wyandanch, New York, hereinafter the "Device."  The Device is currently located at the Homeland Security Investigations Office at 545 Federal Plaza, Central Islip, New York 11722.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

### ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of Title 18, United States Code, Sections 1591 and 1594(c) (sex trafficking and sex trafficking conspiracy), 2422 (interstate prostitution), 1956 (money laundering), 1952(a)(3)(A) (promotion of prostitution), and 1791(d)(1)(F) (possession of contraband within a prison), and Title 21, United States Code, Sections 841(a), 841(1)(C) and 846 (narcotics trafficking and narcotics trafficking conspiracy) (the "Subject Offenses") and involve DAVID M. AMIN, JR. ("D. AMIN"), BRYCE K. AMIN ("B. AMIN") and PATRICIA PERALTA ("PERALTA") since October 2018, including:

     a.    Images of sex trafficking victims, prostitutes, advertisements for prostitution, or other records documenting or related to sex trafficking;

     b.    Any and all records, documents, invoices and materials that concern any Internet accounts used to create or communicate about sex trafficking advertisements;

     c.    Records and communications regarding sex trafficking or commercial sex, including but not limited to the performance of commercial sexual services, the earnings or proceeds of commercial sex, and the locations used to offer or perform sex services;

     d.    Records or documents related to hotel reservations, including receipts, confirmations, reservations or payment;

     e.    Communications from or to D. AMIN, B. AMIN and/or PERALTA, and any victims or witnesses to their charged crimes;

     f.    Records or documents related to Public Storage facilities used or accessed by D. AMIN, B. AMIN or PERALTA;

g.  Records, documents or communications regarding the use of or payment for contraband cellular telephones within a federal jail facility;

h.  Receipts, ledgers, or other documents related to prostitution, including but not limited to records related to prostitution earnings and records related to contacts utilized for the purposes of prostitution;

i.  Records or documents evidencing by D. AMIN, B. AMIN or PERALTA's membership or affiliation with the Bloods street gang, including but not limited to photos or communications;

j.  Records, including photos, or communications regarding the sale of controlled substances, including but not limited to crack cocaine, fentanyl, heroin or cocaine;

k.  Ledgers or other evidence of debts and sales for narcotic transactions; and

l.  All bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.